Pamela HAMMERS *v.* STATE of Arkansas

CR 76-208                                    550 S.W. 2d 432

Opinion delivered May 16, 1977
(In Banc)

*Wilson & Wilson* and *Hanks, Taylor & Suddarth,* Clayton, Mo., for appellant.

*Bill Clinton,* Atty. Gen., by: *B. J. McCoy,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. We are confronted here with a difficult problem arising from the ago-old necessity for "dealing" with people involved in crimes in order to

successfully prosecute their confederates. See *Camron v. Texas,* 32 Tex. Crim. 180, 22 S.W. 682 and accompanying Annot, 40 ASR 767 (1893). Pamela Hammers, appellant herein, and James E. Stephens,[1] were jointly charged with the murder of Cynthia Walker, by choking, beating and drowning her. They were also charged with manslaughter for causing the death of Ms. Walker's unborn child. Apparently, the prosecutor felt it was necessary, as it often is, to obtain the testimony of one of them against the other, if anyone was to be punished for the heinous crime committed by them. It eventually turned out, as is so often the case, both exhibited that extreme generosity about sharing the blame that makes accomplice testimony suspect. Each also seemed extremely reluctant to claim an equal share of the responsibility.

In spite of a "deal" made by appellant with the prosecuting attorney, she was put to trial, found guilty upon the testimony of Stephens, and some corroborating evidence tending to connect her with the crime, and sentenced to eight years' imprisonment. Prior to trial, she had moved to stay and enjoin the prosecution, alleging that she had waived her privilege against self-incrimination upon the offer and promise of the prosecuting attorney to request immunity for her and to nolle prosequi the charge against her. She alleged that, in accordance with this offer, she made an oral statement in which she divulged completely and totally all facts concerning the crimes with which she and Stephens were charged. The denial of this motion is her first and principal ground for reversal of the judgment against her. A reversal would mean that a participant, perhaps the principal one, in a cruel, useless killing escapes punishment. Of course, this should not be the basis for our decision on the important questions raised, and the ultimate disposition of this case must not be dictated by that possibility.

The difficulties with which the treatment of such a troublesome problem as this is fraught are exacerbated by the potential for disagreement and misunderstanding inherent in the failure to put in the record a written memorandum of the

---

[1]This defendant was charged as "James E. Stevens." When he testified at the trial his name was "Stephens." We will use the latter spelling throughout this opinion.

agreement or to obtain a court approval, as required by statute, by the very disorganized presentation of this matter to the trial court and by the manner of the abstracting of the record by appellant which shows little regard for our rules. Although we are considerably handicapped in doing so, we will endeavor to glean enough facts from appellant's unsatisfactory abstract and the state's effort to supply the deficiencies to treat the basic problem. Our effort to state facts may not be totally successful, because very little, if any, evidence was presented to the trial court at the hearings on this motion. These hearings consisted for the most part of discourses by the opposing attorneys, which seem to have been part stipulation and part argument, and we have experienced considerable difficulty in distinguishing a statement of fact from an argument. The record discloses that a memorandum of the agreement was prepared, or was to have been prepared, but it is apparently not in the record, perhaps because the parties endeavored to stipulate the facts.

It was charged that the crimes were committed on July 27, 1975. The information charging the crime of murder was originally filed August 4, 1975, and an amended information, on August 6, 1975. On September 23, 1975, appellant filed a motion for severance, alleging that she would be prejudiced by a joint trial because the issues were different and separate as to the respective codefendants, because Stephens had previously been convicted of felonies on two occasions, because she anticipated that statements of both codefendants, which were inconsistent with each other, would be offered in evidence, and because she anticipated that statements made to a witness by the defendants would be offered in evidence, some of which would not be applicable to her. This motion, which made no claim of immunity, was granted. As a matter of fact, there had been no negotiations of any sort between appellant and the state at that time.

At some time prior to November 4, 1975, appellant, acting upon the advice of her attorney, entered into plea bargaining with the prosecuting attorney and his deputy. It is conceded that some agreement, the exact terms of which we are unable to discern, was entered into between the prosecuting attorney and appellant. It did require appellant

to waive her privilege against self-incrimination and to testify against Stephens. The prosecuting attorney agreed, in return, to move the court to enter a nolle prosequi and grant her total immunity against the charges against her. It was on November 3, 1975, the eve of the trial of Stephens, set for November 4, 1975, that appellant agreed to the terms and made a statement about the crime. She was present in court on November 4, 1975, ready, willing and able to testify, but the case was continued on motion of the state, because of the strange overnight disappearance of Thomas Griffin, a resident of California, who could have given and eventually did give, testimony about incriminating statements of the codefendants in the presence of each other, tending to connect them with the crime. An inquiry of the prosecuting attorney by appellant's attorneys on that day confirmed the fact that they still had a "deal."

Subsequently, upon a motion for discovery by the attorney for Stephens, filed about February 4, 1976, appellant's statement was supplied to this attorney. Thereafter, Stephens submitted to a polygraph test and on March 8, 1976, made a complete and detailed statement about the crime to the prosecuting attorney, and changed his plea from one of not guilty to one of guilty to the charges of murder in the second degree and of possession of marijuana and agreed to testify against appellant. Appellant was then notified that the prosecuting attorney was withdrawing from the agreement and would prosecute her on the charges of murder and manslaughter. The prosecuting attorney took the position that the agreement was binding only if and when appellant took the witness stand and testified against Stephens, but that when Stephens pleaded guilty the agreement did not require him to grant immunity or to nolle prosequi the charges. He returned the statement of appellant to her, and erased the tape on which it had been recorded. No reference to the statement was made during the trial. The prosecuting attorney also contended that the agreement was tentative, not binding because it had not been approved by the court, and void because the statement given by appellant was not made in good faith.

Appellant was, on November 4, represented by two attorneys, both of whom made affidavits in support of her mo-

tion. One of them stated that appellant's total immunity was not dependent upon Stephens going to trial. The other stated that she was granted immunity in exchange for her statement given and testimony to be given under oath, in the case of *State of Arkansas* v. *James Eddie Stephens,* and that on November 4, 1975, the guarantee of total immunity was affirmed and unconditionally promised by the prosecuting attorney and his deputy. The latter affiant stated that he was led to believe and did believe that all charges would be dismissed against appellant and that it would not be necessary that she stand trial. The prosecuting attorney contended that the agreement required "complete testimony" and that the prosecution should be permitted to continue because he had not moved and the court had not granted a nolle prosequi. In the state's response to appellant's motion it was alleged that the state had altered its position after further investigation revealed that the statement given by appellant was not made in good faith.

We cannot give great weight to the state's contention that appellant did not act in good faith, because that charge was not sustained by evidence. We could speculate that the state's attorneys had concluded that she had not made a full disclosure or that she had not stated the truth, but there was no showing, when the motions were heard, on which the trial court could have found that appellant had not made a complete and detailed statement of the occurrence or that she was untruthful. Furthermore, there was nothing to show that appellant was not, at all times, ready, willing and able to testify against Stephens had she been called as a witness, in spite of the fact that the prosecutors had some apprehension about the matter. We should add that we find no basis for holding that any of the attorneys had not acted in good faith in the matter.

It should be noted that the state has never moved for a nolle prosequi or for an order granting immunity to appellant, and, of course, no such order has been entered. It is clear that appellant's attorney was fully aware of the fact that immunity could only be granted by the court and that a nolle prosequi could not be entered without the approval of the court. As a matter of fact, one of them stated at the hear-

ing that he fully understood that the trial court had the authority "not to honor the prosecuting attorney's request for immunity and a nolle pros" at the time of the hearing. The trial judge was aware when the Stephens trial was first set that appellant was going to testify and that she would give a statement or reduce her statement to writing, but no motion for the grant of immunity, even conditionally, was presented to him.

Since the parties attempted to stipulate the facts,[2] we set out certain facts in addition to those previously stated upon which there appears to be no dispute. As a result of the plea bargaining, appellant made a written statement about the crime, and agreed that her testimony against Stephens would be based upon the content of that statement. When the Stephens case was continued, Mr. Hanks, one of appellant's attorneys, in the presence of Mr. Wilson, her other attorney, asked Mr. Banks, the deputy prosecuting attorney, if they did have a deal for her testimony and for her immunity. There was some agreement to the effect that the agreement would be nullified if appellant did not testify, but the terms of that agreement are the subject of vigorous dispute. The prosecuting attorneys contend that the agreement was not binding if she did not testify for any reason, regardless of the cause and regardless of her being ready, willing and able to do so. On the other hand, appellant's position is that the agreement was to become void, only if she refused to testify against Stephens or if her testimony was not substantially in accord with her statement. Appellant's attorney, Hanks, was under the impression that there was a specific understanding that the agreement guaranteed appellant immunity if Stephens pleaded guilty. It was agreed that the state's attorneys were very apprehensive about appellant's actually carrying out her agreement to give testimony incriminating

[2]According to the statements of the attorneys a memorandum or document evidencing the agreement was to have been prepared. Appellant's attorney stated that he and his co-counsel understood that they could prepare such a memorandum and that the deputy prosecuting attorney would file it on the morning of Stephens' trial. Such a memorandum does not appear in the record and this is regrettable. Excellent guidelines for procedures in cases of this sort appear in *U.S.* v. *Ford,* 99 U.S. 594, 25 L. Ed. 399 (1879) and *People* v. *Brunner,* 32 Cal. App. 3d 908, 108 Cal. Rptr. 501 (1973); *People* v. *Bryant,* 409 Ill. 467, 100 N.E. 2d 598 (1951).

Stephens. The prosecuting attorney admitted that, in the negotiations, he may well have said that he had no reason to believe that, if he requested immunity for appellant, the court would not grant it.

Of course, there has long been a universal practice of granting immunity, or sentencing consideration, to an accomplice who testifies fully, fairly and clearly, when called as a witness by the prosecution at the trial of an associate in crime. See (Whiskey Cases) *United States* v. *Ford,* 99 U.S. 594, 25 L. Ed. 399 (1879); *State* v. *Crow,* 367 S.W. 2d 601 (Mo., 1963); *Camron* v. *State,* 32 Tex. Crim. 180, 22 S.W. 682, 40 Am. St. Rep. 767; *People* v. *Bryant,* 409 Ill. 467, 100 N.E. 2d 598 (1951); Annot, 40 Am. St. Rep. 767, 768. In the absence of statute, the testifying accomplice has only an equitable, not legal, right to immunity or mercy. *U.S.* v. *Ford,* supra; *People* v. *Bryant,* supra; *Lowe* v. *State,* 111 Md. 1, 73 A. 637 (1909); *State* v. *Guild,* 149 Mo. 370, 50 S.W. 909 (1899); *State* v. *Graham,* 41 NJL 15 (1879); *Commonwealth* v. *St. John,* 173 Mass. 566, 54 N.E. 254 (1899); *Wight* v. *Rindskopf,* 43 Wis. 344 (1877). See also, Annot. 13 ALR 2d 1439; *State* v. *Crow,* supra.

It is only appropriate that an accomplice who, under an agreement with the prosecuting attorney, approved by or made known to the court, that he should be immune from prosecution, testifies fully and truthfully as to the whole matter charged, be vested with an equitable right to the entry of a nolle prosequi or appropriate clemency. *Lowe* v. *State,* supra; *Scribner* v. *State,* 9 Okla. Cr. 465, 132 P. 933 (1913). Cf. *U.S.* v. *Carter,* 454 F. 2d 426 (4 Cir., 1972), cert. den. 417 U.S. 933, 94 S. Ct. 2646, 41 L. Ed. 2d 237.

Clearly a promise of immunity approved by, or with the consent of, the court, should be upheld. See *State* v. *Ward,* 112 W. Va. 552, 165 S.E. 803, 85 ALR 1175 (1932); *Lowe* v. *State,* supra. Transactional immunity, i.e., full immunity from prosecution for the offense to which the testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege against self-incrimination, since immunity from use of the testimony, and evidence derived from it, affords Fifth Amendment protection. *Kastigar* v. *U.S.,* 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972);

*State* v. *Quarles,* 13 Ark. 307. Ordinarily, in the absence of statute, the public prosecutor is not authorized to grant immunity and it can be granted only with the approval of the court pursuant to express statutory authority. *U.S.* v. *Ford,* supra; *U.S.* v. *Carter,* supra; *Whitney* v. *State,* 53 Neb. 287, 73 N.W. 696 (1898); *Messenger* v. *State,* 81 Tex. Cr. 465, 198 S.W. 330 (1917); *Apodaca* v. *Viramontes,* 53 N.M. 514, 212 P. 2d 425, 13 ALR 2d 1427 (1949) and accompanying Annot, p. 1439. See also, *Temple* v. *Commonwealth,* 75 Va. 892 (1881); *Ex parte Werner,* 46 R.I. 1, 124 A. 195 (1924); *U.S.* v. *Levy,* 153 F. 2d 995 (3 Cir., 1946); *Scribner* v. *State,* supra. But even when the agreement is unauthorized, an accomplice who actually testified against a confederate voluntarily and made a full, true and candid disclosure of all the circumstances attending the transaction in question, in good faith, incriminating both the confederate and himself, has been held to have an equitable claim or right to mercy in some form. *People* v. *Bryant,* supra, 409 Ill. 467; *State* v. *Davis,* 188 S. 2d 24 (Fla., 1966), cert. den. 194 S. 2d 621; *Commonwealth* v. *St. John,* supra; *Application of Parham,* 6 Ariz. App. 191, 431 P. 2d 86 (1967); Annot, 13 ALR 2d 1439 (1949). See also, *U.S.* v. *Ford,* supra; *Lowe* v. *State,* supra; *State* v. *Guild,* supra; *State* v. *Graham,* supra; *Wight* v. *Rindskopf,* supra; *People* v. *Brunner,* 32 Cal. App. 3d 908, 108 Cal. Rptr. 501 (1973). Cf. *U.S.* v. *Carter,* supra; *U.S.* v. *Levy,* supra. It has been recognized that when all parties concerned acted in good faith and an honest effort to dispose of the charges in the manner that would best serve the public welfare, equity requires that a prosecutor's compact be enforced, when he is willing. *State* v. *Ashby,* 43 N.J. 273, 204 A. 2d 1 (1964); *Young* v. *State,* 45 Tex. Cr. 202, 75 S.W. 23 (1903). It has also been widely held that an agreement for immunity which a prosecuting attorney made without consent or advice of the trial court is unenforceable. Annot, 40 Am. St. Rep. 767, 768.

This court has said, when there was no statute on the subject, that it is within the exclusive discretion of the prosecuting attorney to determine whether an accomplice be permitted to become "state's evidence" and whether, if he does, he is entitled to be no further prosecuted by reason of what he has done. *Runnels* v. *State,* 28 Ark. 121. The determination whether the accomplice be called as a witness and

permitted to testify so as to gain an exemption on the basis of an implied condition of exemption from punishment for turning informer and declaring the whole truth is within the discretion of the prosecuting attorney and the sound judicial discretion of the court. Annot, 40 Am. St. Rep. 767, 768. See also, *State v. Reed,* 127 Vt. 532, 253 A. 2d 227 (1969).

There is a wide divergence of authority as to the relief to be granted and the means of obtaining the relief, where there has been no court approval of a promise of immunity made by the public prosecutor. In at least one jurisdiction, it has been held that such an agreement affords no protection if the confessing accomplice is later placed on trial in violation of the agreement. *Whitney v. State,* 53 Neb. 287, 73 N.W. 696 (1898). In many others, the agreement cannot be raised as a plea in bar or as a defense. *U.S. v. Ford,* supra, 99 U.S. 594; *Lowe v. State,* supra, 111 Md. 1; *State v. Guild,* supra, 149 Mo. 370; *State v. Graham,* supra, 41 NJL 15; *Commonwealth v. St. John,* supra, 173 Mass. 566. See also, *Wight v. Rindskopf,* supra, 43 Wis. 344; *State v. Davis,* supra, (Fla.) 188 S. 2d 24. In one of these jurisdictions, the immunity agreement may affect the right of the court to enforce or impose a sentence. *State v. Davis,* supra. A plea in bar is proper in Texas and Oklahoma if all prerequisites to grant of immunity have been met. See *Camron v. State,* supra, 32 Tex. Cr. 180; *Scribner v. State,* supra, 9 Okla. Cr. 465, 132 P. 933; Annot, 40 Am. St. Rep. 767, 768. In some cases it has been said that the only relief available is a continuance to enable the claimant of the right to immunity to apply for a pardon. *U.S. v. Ford,* supra; *Lowe v. State,* supra; *State v. Guild,* supra; *State v. Graham,* supra; *Commonwealth v. St. John,* supra; *Wight v. Rindskopf,* supra.

Of course, where immunity is granted pursuant to statute, the statutory provisions usually provide for relief by a bar of prosecution, where the claimant of right to immunity shows that he comes within the statute. See *State v. Smith,* 12 Wash. App. 514, 530 P. 2d 354 (1975). But appellant does not come within the terms of any Arkansas statute governing immunity from prosecution. Ark. Stat. Ann. § 43-915 (Repl. 1964) only provides use immunity for an accomplice who actually testifies before a grand jury. *Rhea v. State,* 226 Ark. 581,

291 S.W. 2d 505. It does not apply where a written statement has been given to the prosecuting attorney. *Horner* v. *State,* 255 Ark. 426, 501 S.W. 2d 217. A use immunity is granted a defendant in a suit to recover money lost by gaming or betting who answers interrogatories propounded by the plaintiff. Ark. Stat. Ann. §§ 34-1607, 1608 (Repl. 1962). The only statute which could possibly apply is Act 561 of 1973, appearing as Ark. Stat. Ann. § 28-531 et seq (Supp. 1975). That statute was passed for the very purpose of establishing guidelines to facilitate prosecutions and to clarify the authority of the prosecuting attorney to grant immunity in cases such as this. See preamble. But it *prohibits* the grant of immunity from prosecution without *prior* court approval. Ark. Stat. Ann. § 28-534 (Supp. 1975). And appellant was certainly not compelled to testify in spite of a claim of privilege against self-incrimination, which would be essential to a claim of immunity under Ark. Stat. Ann. § 28-532 (Supp. 1975). Such a statute is not self-executing [see *U.S.* v. *Seavers,* 472 F. 2d 607 (6 Cir., 1973)] and its purpose is only to preserve the constitutional privilege of self-incrimination to one compelled to testify. *State* v. *Smith,* 12 Wash. App. 354, 530 P. 2d 354 (1975). See also, *Scribner* v. *State,* supra, 9 Okla. Cr. 465; *State* v. *Davidson,* 242 Wis. 406, 8 N.W. 2d 275, 145 ALR 1411 (1943).

Since appellant had no statutory right to immunity and the agreement was not authorized by the court, her claim must be viewed as one to relief on equitable principles. In doing so, it seems that leaving her to beseech mercy at the hands of the Governor is as antiquated as the doctrine of approvement[3] from which it springs. The Texas and Oklahoma preference for permitting a plea in bar seems highly superior to other procedures, even though contrary to the weight of authority. See, Annot, 40 Am. St. Rep. 767, 768; *Whitney* v. *State,* supra, 53 Neb. 287. The trial court certainly has no power to enter a nolle prosequi over the objection of the prosecuting attorney. Ark. Stat. Ann. §§ 43-806, 1230 (Repl.

---

[3]Under this doctrine, one charged with a capital offense could confess the charge and accuse another as his accomplice in order to obtain a pardon. If the one charged as accomplice was found guilty, the approver was entitled to his pardon, but if the alleged accomplice was acquitted, judgment went against the approver. See *U.S.* v. *Ford,* supra.

1964). *State* v. *Anderson*, 119 Tex. 110, 26 S.W. 2d 174, 69 ALR 233 (1930) and accompanying Annot p. 240; *Commonwealth* v. *Hughes*, 153 Ky. 34, 154 S.W. 399 (1913); *Commonwealth* v. *Shields*, 89 Pa. Super. 266 (1926). Neither the trial court nor the appellate court may compel a nolle prosequi; they can only suggest it. Annot, 35 LRA 701 (1895). And the power of the court to grant immunity is statutory, not constitutional. *Ferrantello* v. *State*, 158 Tex. Cr. 471, 256 S.W. 2d 587 (1953). In the absence of statute, it has no such power. *People* v. *English*, 31 Ill. 2d 301, 201 N.E. 2d 455 (1964). There is no statute empowering the trial court to do so, except for Ark. Stat. Ann. § 28-531 et seq. In our view, the court's hearing appellant's motion was proper and appellant should not be denied relief on the basis that her motion was in substance a plea in bar.

But determination of a claimant's equitable entitlement to immunity, when opposed by the prosecuting attorney, should lie within the sound judicial discretion of the trial court, which should see that the public faith pledged by the public prosecutor, in the furtherance of justice, is kept by giving due regard to promises and inducements made and held out by him, when the claimant has fulfilled his agreement in good faith. *State* v. *Sceresse*, 84 N.M. 312, 502 P. 2d 1002 (1972)[4]; *State* v. *Reed*, supra, 127 Vt. 532; *People* v. *Brunner*, supra, 32 Cal. App. 3d 908; *Commonwealth* v. *St. John*, supra, 173 Mass. 566; *Camron* v. *State*, supra, 32 Tex. Crim. 180. See also, *Wight* v. *Rindskopf*, supra, 43 Wis. 344 (1877); *People* v. *Johnson*, 372 Ill. 18, 22 N.E. 2d 683 (1939); *People* v. *English*, 31 Ill. 2d 301, 201 N.E. 2d 455 (1964); *U.S.* v. *Carter*, supra. It is appropriate to consider the extent of the claimant's performance of the bargain. *People* v. *Brunner*, supra. In doing so, it should be remembered that the primary purpose of the exchange is to facilitate the prosecution of crime, not to grant immunity. *State* v. *Smith*, supra, 12 Wash. App. 514. See Act 561 of 1973, preamble.

---

[4]In a sequel to this case, we learn that Plant, the defendant who benefited from the unauthorized promises of the prosecuting attorney, was tried for aggravated burglary connected with the murder on which the New Mexico Supreme Court held that Plant was entitled to immunity. *State* v. *Plant*, 86 N.M. 2, 518 P. 2d 961 (1974).

Although the state is not estopped by the unauthorized act of its agent, (*State* v. *Smith*, supra, 12 Wash. App. 514; cf. *Pulaski County* v. *State*, 42 Ark. 118; *Terry* v. *Little Rock Civil Service Commission*, 216 Ark. 322, 225 S.W. 2d 13), appellant should be equitably entitled to have her agreement with the prosecutor enforced if she complied with its terms in good faith and made a full, fair, free and candid disclosure of all facts pertaining to the crimes charged, even though that requires barring her prosecution for the crimes. There does not seem to be any doubt about her being ready, willing and able, but not called upon, to testify. The burden of proving the agreement and appellant's compliance with it rested upon her. *Turney* v. *State*, 40 Tex. Cr. 561, 51 S.W. 243 (1899); *State* v. *Moody*, 69 N.C. 529 (1873). See also, *People* v. *Johnson*, 255 Ill. App. 288 (1929). In spite of the very unsatisfactory record, we might endeavor to determine whether that burden had been met if the trial court had ruled upon the matter. From our examination of the record, it is clear that the trial judge simply ruled that appellant was not entitled to immunity because no agreement for it had been approved by the court and the state had not sought approval or moved for a nolle prosequi.

It almost goes without saying that, whatever the agreement may have been, the statement given by her could not be considered voluntary. See Annot, 7 ALR 419; *Sullivan* v. *State*, 66 Ark. 506, 51 S.W. 828, 11 Am. Crim. Rep. 280. But appellant's privilege against self-incrimination was fully protected by the return of the transcription of the tape on which it was recorded, and the tape itself, and the non-use of the statement or its content as evidence or in cross-examination, just as effectively as it would have been upon suppression of a confession as involuntary upon any other ground, unless the state discovered other evidence through it, either directly or indirectly. But this is the basis of another asserted ground for reversal, i.e., that the testimony of Stephens should have been suppressed as fruit of the poisonous tree. The trial court held that it was not. We must affirm that holding, because it was not clearly against the preponderance of the evidence.

It is appellant's contention that Stephens' plea of guilty

and his agreement to testify against her was the result of her giving her statement. But there is evidence to the contrary (even though appellant failed to abstract it), and some of the facts are undisputed. Stephens testified substantially as follows:

> The first or second time I saw my attorney, Bill Ross, I advised my attorney that I wanted to enter into negotiations with the prosecuting attorney's office for a negotiated plea. I believe this was in the month of August. These negotiations were continued up until the November term of court with my approval. On November 5, I assumed, because I know Pamela Hammers, that she had made a statement involving me in this crime. I continued to approve my attorney's efforts to negotiate a plea and repeatedly asked for a polygraph test. I had not made a complete statement to my attorney. I took the polygraph test on March 7, 1976. I entered a plea of guilty on March 8. I had never talked to either of the prosecutors about this crime. A day or two after I was sentenced, I made a statement.

Ross testified substantially as follows:

> I was appointed as counsel for Stephens on August 6 and had the initial interview with him on August 8. I had his custodial statement August 7. I had the custodial statement made by Pamela Hammers. I took a statement from Stephens who told me the same thing he had stated previously. He told me that he did not kill the girl, but that Hammers did. He was going to testify that she did the actual killing, but he helped her dispose of the body. In his custodial statement all he said was, "Talk to Pamela first." I negotiated with the prosecuting attorney on the basis of time only, beginning in August, up until I convinced the prosecuting attorney to give him a lie detector test. As early as October, up to the time he ultimately plead guilty and agreed to testify, the only difference in the negotiations was roughly 15 years. Stephens first indicated his willingness to testify in October or November. At one time I was negotiating for time and that was one of the

elements on which I was negotiating with the prosecuting attorney. At one time, I was negotiating for a plea of murder two and testimony in November. I can't say for sure that we ever discussed the fact that he would testify before the November term. It had to be before the case was set for trial in the November term of court. Prior to the November term, he had been offered a term of 45 or 50 years and I had offered to take murder two and testify at that time. Before Pamela's statement was taken, we started negotiating for a reduced sentence, based upon his prosecuting testimony. That offer was rejected at that time. We tried to negotiate, after the witness left and the trial broke down, in exchange for testimony, but the prosecution rejected that.

Pamela Hammers' statement was given in early November. During the November term, I learned that Hammers was going to testify against him. Hanks had told me that she was not going to testify at all. Then I heard he was talking to the prosecuting attorney. Stephens advised me she was going to testify. I think he surmised it. He asked me about it and asked me if they would be willing to give him a murder two for prosecution at that time. They were talking to the prosecuting attorney and we were talking to him. Nobody had reached a "negotiation." We were both trying to get to the same place at the same time and we didn't make it.

In November Stephens was only aware that she had implicated him. We were informed during the November term of court that a statement was given and that she was going to testify. I obtained a copy of her statement February 8, only for the purpose of preparing for trial. He read the statement right after February 8. The statement had no relationship to any negotiations. The only thing we were doing from August 1 on was negotiating for time, until I convinced the prosecuting attorney he should let Stephens take a lie detector test. That was the turning point. After he took and passed the lie detector test, I was able to negotiate the time down to a certain time of 31 years, after the prosecuting attorney read the results of the lie detector test. There

was no agreement to reduce the charge to murder two. When we went to Harrisburg on March 8 to enter the plea, the prosecuting attorney had some skepticism about pleading to a term of years, rather than life for murder one, so the plea was to murder two and on the other charge. Stephens did not make a statement until after he took the polygraph test. It was after he was sentenced on March 8.

The burden was on the state to show that it had an independent, legitimate source for Stephens' testimony. *Murphy v. Waterfront Commission of New York,* 378 U.S. 52, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964); *Kastigar* v. *U.S.,* supra, 406 U.S. 441. The trial court found that it could hardly be said that the existence of the testimony of, or evidence known to, Stephens was discovered or made known by reason of any statement obtained from Pamela Hammers, that the facts and circumstances disclosed did not bring the case under the "fruit of the poisonous tree doctrine," and that the state would not be deprived of his testimony in a prosecution of appellant. This finding of fact should be reviewed in the same manner as we review the finding that a confession is voluntary, i.e., it should not be reversed unless it is clearly against the preponderance of the evidence. See *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515. We cannot say that the court's finding was clearly against the preponderance of the evidence.

Appellant also contends that the corroboration of the accomplice was not sufficient to sustain the jury verdict. The corroborating testimony given by Thomas Griffin and Mae Holcott was not fully abstracted by appellant. Griffin had known Stephens and his mother, Mae Holcott, since 1961. He was also acquainted with appellant. He was visiting in the residence of Mrs. Holcott on July 26 and 27, 1975, where appellant and Stephens were also staying. On the evening of the murder, after dinner they borrowed Griffin's car and left about 7:00 or 7:30 p.m. Griffin saw them around 7:30 or 8:00 a.m. the following day. The three left for California about 5:00 or 5:30 p.m. on that day which was Sunday. They arrived in California on Tuesday night or Wednesday morning and checked into a motel in Santa Anna. They all went to

visit Ms. Kay Areman the next day and, on their return trip, Griffin was stopped at about 10:30 p.m. for running a red light. While the police officer was checking identification, Hammers and Stephens disappeared. The policeman then held the car and Griffin had to take a cab. When he returned to the motel, appellant and Stephens were there. When Griffin asked why they ran, Stephens said, in the presence of appellant, that they had killed a girl in Blytheville, strangled her and thrown her in a ditch. According to Griffin, appellant said, when he asked her, "Yes, that is true." Griffin had two telephone conversations with Mrs. Holcott, Stephens' mother. When appellant and Stephens rejected Griffin's suggestion that they surrender, he reported the matter to the officers. Griffin said that he had noticed something on the floor of his car that appeared to be blood with "vomit" in it the morning after he loaned the car to Stephens and Hammers. When he asked about this, Pamela explained that Stephens had ulcers and he had vomited in the car and she would clean it up.

Mae Holcott testified that she had visited appellant in the Mississippi County jail every Sunday and, on one occasion, had asked her if Stephens had done "this thing" and appellant responded, "You can die knowing that Eddie Stephens hurt no one, that I strangled her," and then put her hand over her mouth and said she was sorry, she couldn't tell me more. Mrs. Holcott said she reported this to the sheriff, who advised her to tell her son to tell the truth.

This testimony was sufficient for corroboration. Corroborating evidence need only tend to connect the defendant with the crime. *Klimas v. State,* 259 Ark. 301, 534 S.W. 2d 202. This it did.

We find it impossible to affirm the judgment in this case on the record before us, at least partially because of the trial judge's holding that lack of court approval of the agreement barred relief to appellant. The situation here is somewhat similar to that in *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), where the United States Supreme Court held that a hearing as to the voluntariness of a confession might be held in a separate post-trial hearing.

Appellant is entitled to have a resolution of the factual issues and a determination whether the agreement made, even though unauthorized, should be enforced on equitable principles. Consequently, we vacate the judgment and remand the case to the circuit court with directions to that court to conduct a hearing from which it shall determine from evidence there presented the terms of the agreement and whether appellant is entitled to relief from her prosecution on equitable principles. If the circuit court finds she is entitled to relief, it shall set aside the jury verdict and dismiss the charge against appellant. If the court finds that appellant is not entitled to relief, it shall reinstate its judgment. Of course, the action of the trial court is subject to appellate review, as in other cases.

The judgment is vacated and the cause remanded for further proceedings consistent with this opinion.