# Illinois Official Reports

## Appellate Court

---

*People v. Alexander*, **2014 IL App (1st) 112207**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO ALEXANDER, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-2207 |
| Filed | June 27, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence for the criminal sexual assault of his cousin were upheld on appeal over his contentions that the State failed to prove beyond a reasonable doubt that he penetrated the victim by force and that neither party was allowed to present argument at the sentencing hearing, since the victim's testimony was credible, there was no indication that the victim, who admitted she was intoxicated the prior evening, was so intoxicated that she could not remember what happened, a rational trier of fact could have concluded that penetration occurred, the evidence was not inconsistent with the victim's testimony and showed she attempted to escape from defendant, and the record showed that although the trial court barred the State from arguing at the sentencing hearing, the defense was not barred from presenting argument. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-11312; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Scott F. Main, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Matthew Connors and Anthony M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant Antonio Alexander was convicted of criminal sexual assault for penetrating the vagina of his cousin G.R. with his penis by use or threat of force (720 ILCS 5/12-13(a)(1) (West 2010)), and after hearing factors in aggravation and mitigation, the trial court sentenced defendant to 14 years and 6 months in the Illinois Department of Corrections (IDOC). On appeal, defendant argues: (1) that his conviction should be reversed because the victim's testimony was insufficient to prove defendant guilty beyond a reasonable doubt; and (2) that the case should be remanded for resentencing because the trial court denied both parties the opportunity to present argument at the sentencing hearing. For the following reasons, we affirm.

¶ 2                               BACKGROUND
¶ 3                          I. Pretrial Proceedings
¶ 4    Prior to trial, the State moved in limine to present other crimes evidence from another case, trial court number 10 CR 12701, pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2010)), which enables trial courts to allow the admission of evidence of other crimes to establish the propensity of defendant to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 175-76 (2003). Following a hearing, the trial court granted the State's motion because the other crimes evidence was proper to show propensity, the absence of mistake, motive, intent, and to rebut a consent defense.

¶ 5                                II. Trial
¶ 6    At trial, the State presented four witnesses: (1) G.R., the victim; (2) Relunda Alexander, G.R.'s mother; (3) Iwona Wojas, a registered nurse who examined the victim; and (4) S.B., defendant's cousin. Defendant exercised his constitutional right not to testify or to call any witnesses.

¶ 7                                   A. G.R.'s Testimony

¶ 8        G.R., the victim, testified that she was 24 years old at the time of the trial and that she lived with her three children, seven brothers, niece, and her mother. G.R. did not have her own bedroom in the home and usually slept on the couch in the front room. Defendant was G.R.'s first cousin and she identified him in court.

¶ 9        G.R. testified that, at 7 p.m. on May 14, 2010, she was with several friends and family members, including defendant, at her aunt's home near 71st Street and Marshfield Avenue in Chicago. G.R. periodically left the house that evening to drive round the neighborhood with defendant's sister. During the course of two or three hours in the home, and in defendant's presence, G.R. drank a six-inch-tall bottle of vodka and a three or four-inch-tall bottle of Long Island Iced Tea by herself, which resulted in G.R. feeling talkative, "a little drunk," and "a lot tipsy." G.R. stopped drinking at 10 p.m. and continued to travel in and out of her aunt's home for another five hours.

¶ 10       At 3 a.m., defendant's uncle "June"[1] drove G.R. home. She still felt a little drunk when she arrived at home, so she drank a cup of water in the kitchen. G.R. checked on her children and niece, who were sleeping in the front room, and then went to go sleep in her brothers' empty bedroom. G.R. turned on the television in the bedroom and laid down on the bed. She then received a telephone call from her uncle, who was confused with directions to his own residence after he dropped G.R. off, and she provided him directions back to his home. After the call, G.R. fell asleep facedown on the bed over the sheets, still fully dressed in jeans and a shirt. G.R. left the bedroom door unlocked when she fell asleep.

¶ 11       G.R. testified that, when she awoke, the lights and television in the bedroom were turned off and a man was on top of her. G.R. testified, "I was *** trying to get up from the side of me and I couldn't get up." She could not observe who it was because she was still lying facedown and the room was dark. Although she was fully clothed when she went to sleep, her pants and underwear were down to her knees when she awoke. G.R. turned to the side and was finally able to push the man off her back. As she pushed the man away, she felt the man's penis slide out of her vagina. G.R. sat up and observed the man sitting on the side of the bed and leaning against the wall, and he covered his genitals with both of his hands.[2] G.R. could not identify the man until he spoke, "I'm sorry [G.R.], I'm sorry [G.R.]," and she immediately recognized the voice as that of defendant.

¶ 12       G.R. testified that she then stood up and tried to exit the bedroom, but the door was locked. She unlocked the bedroom door and ran to her mother's bedroom screaming that defendant was having sex with her while she was asleep. G.R.'s mother, Relunda Alexander, then exited from her own bed, lit a cigarette, and walked out of her bedroom saying, "No you didn't, Tony.[3] No you didn't, Tony." From her mother's bedroom, G.R. observed defendant standing by the bathroom across the hall wearing dark jeans, boots, and a hooded sweatshirt–the same

_____

[1]"Uncle June's" full name does not appear in the appellate record.

[2]G.R. did not state whether defendant's pants were on or off.

[3]Presumably, "Tony" is short for defendant's first name Antonio, although G.R. did not explain this in her testimony.

- 3 -

clothes he was wearing the night before. Defendant and Relunda walked into the kitchen together and talked for five minutes, while G.R. stayed in Relunda's bedroom, screaming, "How the [expletive] did he get in here?" Defendant then left the house. Relunda returned to her bedroom and told G.R. that she let defendant in the house so he could play video games.

¶ 13    G.R. testified that, moments later, she answered the telephone but hung up as soon as she heard defendant's voice. The telephone then rang again, but G.R. did not answer the call because it was from the same telephone number. G.R. walked into the kitchen and sat down, crying. She then called her grandmother, defendant's sister, and finally the police. When the police arrived, G.R. told them what happened, and an officer transported her to the hospital. Relunda did not accompany G.R. to the hospital and instead went to work.

¶ 14    On cross-examination, G.R. testified that, although she was a little drunk the night before the incident, she was not "falling over" drunk or dizzy. G.R. also admitted that she was still "a little" intoxicated when she awoke, but not drunk. G.R. testified that, when she woke up in bed with defendant on her back, she felt something inside of her but she never observed what it was. When asked how long it took to get defendant off of her back, G.R. explained, "It didn't take long because first when I tried to get him off me, I couldn't move fast, right on top of me again. I pushed him, got him over again. That's when I pushed him off, I felt him coming out of me." When asked if she had any doubt if a penis was in her vagina, she answered that she was "pretty sure it was his penis." G.R. testified that, although defendant was an inch or two away from her, she could not observe his face because the room was dark and defendant was wearing a hooded sweatshirt that concealed his face. However, G.R. was "100 percent" certain that the man's voice belonged to defendant.

¶ 15                              B. Relunda Alexander's Testimony

¶ 16    Relunda Alexander testified that G.R. is her daughter and defendant is her nephew. On May 14, 2010, she lived with her six children and three grandchildren in the same home. That night, Relunda went to bed at 9 p.m., and her three grandchildren, all under the age of four, were the only other people in the house when she went to sleep. She awoke at 5 a.m. the next morning to the sound of someone at the front door. Relunda answered the door and observed defendant, who told her that he could not sleep and asked if he could come inside and play video games. Relunda granted defendant permission since people came over "all the time" to play video games. Relunda observed defendant going into the bedroom where G.R. was sleeping,[4] and Relunda returned to her own bedroom and went back to sleep. Relunda identified defendant in court.

¶ 17    Relunda testified that, about five to eight minutes later, she heard G.R. calling, "Mama, mama, come here." Relunda "jumped up" and exited her bedroom to check on G.R. While in the hallway, Relunda observed defendant, fully dressed, leave the bedroom where G.R. was sleeping and walk into the front room. Relunda observed G.R. still in the bedroom, and G.R. told her that defendant was on top of her. Relunda then followed defendant into the front room and asked him to explain what had just happened. Defendant appeared to be confused, and he told Relunda that he did not know it was G.R. and repeatedly said he was sorry. Relunda then told defendant to leave. After defendant left, Relunda asked G.R., who was crying, what she

_____

[4]Relunda did not indicate in her testimony whether she knew G.R. was already asleep in her brother's bedroom.

wanted to do and if she wanted to call the police. G.R. initially did not respond and instead called Relunda's mother, who told G.R. to call the police, which G.R. later did. The police arrived and transported G.R. to the hospital, and Relunda left for work.

¶ 18    On cross-examination, Relunda testified that she did not speak with defendant in the kitchen that morning.

¶ 19                        C. Iwona Wojas' Testimony

¶ 20    Iwona Wojas testified that, in May 2010, she was a registered nurse employed by Holy Cross Hospital. At 7 a.m. on May 14, 2010, Wojas met with G.R. in the hospital's emergency room. Wojas asked G.R. what happened to her, and G.R. related that she was sleeping and she awoke with someone on her back. G.R. explained to Wojas that her underwear had been pulled down and she felt a penis in her vagina. G.R. stated that she did not remember anything else because she was sleeping. G.R. did not appear intoxicated and she consented to the collection of a sexual assault kit, which is performed to find out if there is any evidence of the assailant on the victim. Wojas then took G.R.'s clothes, combed through her pubic hair, scraped her nails, administered oral swabs, and took blood samples.

¶ 21    Wojas testified that she then assisted Dr. Amel Cambry to perform a pelvic exam on G.R. Wojas explained that the pelvic and visual examination of G.R.'s vaginal area revealed no evidence of abrasion, entry, or insertion. Wojas did not observe any visual trauma. Wojas explained that it is common for a rape victim to not have injuries because the vagina is designed to stretch to accommodate a penis, as well as stretch for child birth, and that injuries may depend on the amount of lubrication in the vagina.

¶ 22    On cross-examination, Wojas testified that she was not trained in determining whether a patient is intoxicated and she did not perform a sobriety test on G.R. Wojas also testified that it is more likely for there to be a tear or abrasion after a "forced entry" as opposed to consensual intercourse; however, on redirect examination she explained that that is not always true since the vagina is designed to stretch and that lubricants, either natural or artificial, may prevent tears or abrasions. Wojas further stated that the presence of trauma may also depend on whether the woman is relaxed during intercourse and that a person is generally relaxed while asleep.

¶ 23                          D. Stipulated Evidence

¶ 24    Scientific evidence was introduced by stipulation. The parties stipulated that semen was identified in both the oral and vaginal swabs gathered from G.R. Analysis of the sample recovered from the vaginal swab revealed a DNA profile that did not match defendant, and the sample recovered from the oral swab was insufficient to produce a DNA profile suitable for comparison.

¶ 25                            E. S.B.'s Testimony

¶ 26    The State called S.B. to testify to other crimes evidence. S.B. testified that she was 16 years old and that defendant was her cousin. S.B. identified defendant in court. One night in May 2010, S.B. was sitting on the front porch of her family's apartment with defendant, her brother, and her brother's girlfriend, all of whom were smoking marijuana and drinking liquor. S.B. denied drinking liquor but she admitted that she was high from smoking marijuana.

¶ 27    S.B. testified that, later that night, S.B. went to her grandmother's former bedroom, locked the door, and went to sleep on the bed wearing a shirt, shorts, and underwear. S.B. explained that the lock on the bedroom door was a simple knob that could be unlocked using a finger. S.B. was alone in the bedroom when she went to sleep.

¶ 28    S.B. testified that, when she awoke, she observed that her shorts and underwear had been pulled down, and that defendant's head was between her legs and he was licking her vagina. Defendant then sat up and attempted to insert his penis into S.B.'s vagina. Defendant's penis touched S.B.'s vagina, but she told him to stop and she pushed him away. Defendant then left the bedroom without saying anything. S.B. pulled up her pants and walked into the living room five minutes later, where she observed her brother, his girlfriend, and defendant, but she did not tell them what had just happened because she was scared and did not want her brother to fight with defendant in the apartment. S.B. later told her cousin Jessica about the incident the following day.

¶ 29    On cross-examination, S.B. testified that, prior to trial, she told the assistant State's Attorney that she was under the influence of alcohol on the night of the incident, in addition to being high on marijuana. S.B. also testified that she did not receive a medical exam until weeks later.

¶ 30    The State rested after S.B.'s testimony, and the trial court denied defendant's motion for a directed finding. Defendant exercised his constitutional right not to testify.

¶ 31                    F. Closing, Conviction, and Sentence

¶ 32    At closing argument, the defense argued that G.R.'s testimony was unreliable, especially since there was a lack of physical evidence to corroborate her testimony. The State responded that defendant chose his victims based on their intoxication, and that the circumstantial evidence was sufficient to corroborate G.R.'s testimony that penetration occurred.

¶ 33    The trial court found that the evidence was "overwhelming" that defendant was present and that the State proved him guilty of criminal sexual assault beyond a reasonable doubt based on G.R.'s testimony that she recognized defendant's voice and other corroborative evidence, including defendant's repeated apologies.

¶ 34    At the sentencing hearing, the trial court denied defendant's posttrial motion for a new trial. The State advised the trial court that, although G.R. was present in the courtroom for sentencing, she declined to provide a victim impact statement. The State then told the trial court, "We have no additional evidence. We only have argument." In mitigation, the defense presented letters from defendant's wife and sister, as well as a certificate of academic progress from the jail's Pace staff, which acknowledged defendant's progress in math. The defense also stated that the presentence investigation report had been reviewed by defendant and that the report was accurate. Defendant made a statement in allocution and apologized to his family and to G.R. specifically.

¶ 35    As the trial court began to pronounce the sentence, the State objected, stating, "I indicated that I had no evidence, but I did wish to argue." The trial court responded, "I don't do it like that. You are done." The defense did not object or otherwise express interest in argument. The trial court then sentenced defendant to 14 years and 6 months in the IDOC. The trial court admonished defendant of his right to file a motion for reconsideration, but no such motion was filed.

¶ 36    This appeal follows.

¶ 37                                    ANALYSIS

¶ 38    On appeal, defendant argues: (1) that his conviction should be reversed because the victim's testimony was insufficient to prove that defendant penetrated, or used force to penetrate, G.R.'s vagina beyond a reasonable doubt; and (2) that the case should be remanded for a new sentencing hearing because the trial court denied both parties the opportunity to present argument in aggravation and mitigation. For the following reasons, we affirm.

¶ 39                          I. Sufficiency of the Evidence

¶ 40    Defendant first challenges the sufficiency of the evidence, arguing that the State did not prove defendant guilty of criminal sexual assault beyond a reasonable doubt because G.R.'s testimony was insufficient to prove that penetration occurred, and as a result, his conviction should be reversed. Alternatively, defendant argues that his conviction should be reduced to a battery since the evidence was insufficient to prove that penetration occurred by the use or threat of force. The State argues that G.R. was a credible witness and her testimony, along with other corroborative evidence, was sufficient to prove that penetration occurred by the use of force.

¶ 41    When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *People v. Smith*, 185 Ill. 2d 532, 541 (1999)).

¶ 42                          A. Evidence of Penetration

¶ 43    Defendant first claims that the State's evidence was insufficient to prove that he penetrated G.R.'s vagina, an element of the offense of criminal sexual assault. Section 12-12(f) of the Illinois Criminal Code of 1961 (Criminal Code) defines "sexual penetration" as "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person." 720 ILCS 5/12-12(f) (West 2010). Defendant argues that G.R.'s testimony was unreliable because she admitted that she was intoxicated both before she went to sleep and after she woke up. Since G.R. testified that she was intoxicated and that she never actually observed something come out of her vagina, defendant argues that her statement that she was merely "pretty sure" that defendant's penis was inside of her was nothing more than a drunken belief that something penetrated her and that she later concluded it was defendant's

penis. Additionally, defendant claims that there is no physical evidence to corroborate G.R.'s testimony since the pelvic exam revealed no abrasions or tears that would indicate forced entry, and that DNA profile recovered from the vaginal swab did not match defendant. Defendant concludes that this dearth of evidence was insufficient to prove beyond a reasonable doubt that he penetrated G.R. We do not find this argument persuasive.

¶ 44     In the case at bar, a rational trier of fact could have found that defendant penetrated G.R.'s vagina beyond a reasonable doubt. "The testimony of a single witness, if it is positive and the witness [is] credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Here, G.R. testified that she felt defendant's penis come out of her when she pushed him off of her back, and when the defense asked G.R. on cross-examination if she had any doubt that defendant's penis was in her vagina, she responded that she was "pretty sure it was his penis." The trial court heard G.R.'s testimony and found her credible, and a rational trier of fact could have found that penetration occurred beyond a reasonable doubt.

¶ 45     Although defendant focuses on G.R.'s statement that she was only "pretty sure" that defendant's penis was in her vagina, which defendant suggests is not sufficient to prove penetration, the Criminal Code does not require the State to prove specifically what type of penetration occurred. *People v. Harper*, 251 Ill. App. 3d 801, 806 (1993) ("In a case involving sexual penetration, the specific type of penetration is not an element of the offense."); *People v. Foley*, 206 Ill. App. 3d 709, 718 (1990) ("The type of sexual penetration is not an element of the offense," and "[t]he State need only prove that *a* type of sexual penetration occurred beyond a reasonable doubt." (Emphasis in original.)). Even if G.R. was uncertain whether defendant penetrated her with his penis or with another object, her testimony that she felt something come out of her vagina as she pushed defendant away is sufficient to prove the element of penetration. Other parts of G.R.'s testimony are consistent with penetration occurring, such as her statements: (1) that defendant was on top of her (*People v. Raymond*, 404 Ill. App. 3d 1028, 1058-59 (2010) (eyewitness testimony that defendant was lying on top of the victim consistent with penetration)); (2) that her shorts and underwear had been pulled down (*People v. Bounds*, 171 Ill. 2d 1, 43 (1995) (victim's state of undress was consistent with penetration)); and (3) her prompt outcry and her statements to Iwona Wojas at the hospital (*People v. Wych*, 248 Ill. App. 3d 818, 824 (1993) (victim's prompt outcry and statements to medical personnel consistent with penetration); *People v. Bock*, 242 Ill. App. 3d 1056, 1078 (1993) (same)).

¶ 46     Furthermore, although G.R. testified that she was intoxicated both before she fell asleep and after she woke up, the appellate record does not support the inference that she was so inebriated that she was unable to sense an object in her vagina. G.R. testified that she stopped drinking liquor at 10 p.m. the night before the incident, that she was not dizzy or "falling over" drunk, and that she was coherent enough to provide defendant's uncle with directions to his home after he dropped G.R. off before she went to sleep. She testified that she was only "a little" intoxicated when she awoke, and nurse Wojas testified that G.R. did not appear drunk when she examined G.R. at the hospital at 7 a.m.

¶ 47     Additionally, the physical evidence recovered for the sexual assault kit was not inconsistent with G.R.'s testimony. The parties stipulated that the lab results revealed that semen was found in samples recovered from both oral and vaginal swabs, but one DNA profile did not match defendant and the other was unsuitable for comparison. However, "[e]vidence of emission of semen is not required to prove sexual penetration." 720 ILCS 5/12-12(f) (West

- 8 -

2010). Here, the presence of semen could have originated from a prior sexual partner since G.R. did not testify that defendant ejaculated during the assault. In addition, a lack of vaginal trauma is not inconsistent with penetration. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 89 (finding penetration without evidence of vaginal trauma). Although the pelvic exam did not reveal any tears or abrasions, which are often caused by forced entry, nurse Wojas testified that it is not common for such injuries to result from a sexual assault. Wojas explained that the vagina is designed to stretch, and abrasions may depend on how much lubrication is found in the vagina and the victim's state of relaxation. Wojas testified that a person is generally relaxed when she is asleep, as G.R. was asleep when the penetration occurred. As such, the physical evidence is not inconsistent with G.R.'s testimony that defendant penetrated her.

¶ 48    We also note that, while there was no corroborating witness testimony concerning the finding of actual penetration, there was corroborating evidence of other aspects of G.R.'s recounting of the events. For instance, G.R.'s mother Relunda testified that she heard G.R. cry out for her, stating that defendant was on top of her. Relunda then observed defendant emerge from the bedroom and apologize, saying that he did not know it was G.R. Additionally, Wojas testified that G.R. told her at the hospital that she awoke with a man on her back, that her pants were pulled down, and that the man's penis was in her vagina. S.B.'s testimony that defendant assaulted her while she was asleep is further corroboration that penetration occurred. *People v. Cloutier*, 156 Ill. 2d 483, 505-06 (1993). S.B. testified that she went to sleep while high on marijuana and that she woke up to find her pants pulled down and defendant licking her vagina. S.B. testified that defendant then attempted to insert his penis into her vagina and that she pushed him away to stop him. S.B's testimony is similar to G.R.'s account since both victims fell asleep intoxicated with either liquor or drugs and woke up with their pants and underwear pulled down and felt defendant in contact with their genitals. This evidence of other crimes corroborated G.R.'s account and established the propensity of defendant to commit the charged crime. *Donoho*, 204 Ill. 2d at 175-76.

¶ 49    Defendant argues that Relunda's testimony is unconvincing because she observed defendant standing in the hallway fully dressed shortly after awaking to her daughter's cries. However, G.R. never testified whether or not defendant had his pants on during the assault, but she stated that he was wearing a hooded sweatshirt that concealed part of his face. The fact that Relunda observed defendant in the hallway fully clothed does not discredit G.R.'s testimony because it may have taken defendant only a matter of seconds to pull up and fasten his pants by the time Relunda observed him exit the bedroom. Defendant also claims that S.B.'s testimony was not credible because she was high at the time of the alleged assault. However, there is nothing in S.B.'s testimony that suggests that she was so intoxicated that she misperceived the entire incident the next morning.

¶ 50    As stated, the trial court observed G.R. testify and it found her to be credible. We cannot say that the evidence at trial was so unreasonable, improbable, or unsatisfactory as to give rise to a reasonable doubt that penetration occurred, and we decline to reverse defendant's conviction as a result.

¶ 51                          B. Evidence of Use or Threat of Force

¶ 52    Defendant alternatively claims that, even if penetration occurred, the evidence was insufficient to prove that defendant used physical force to complete the assault. In the case at bar, defendant was convicted of criminal sexual assault pursuant to section 12-13(a)(1) of the

Criminal Code, which states, "The accused commits criminal sexual assault if he or she *** commits an act of sexual penetration by the use of force or threat of force ***." 720 ILCS 5/12-13(a)(1) (West 2010). A conviction for criminal sexual assault cannot be sustained by merely establishing that the victim did not consent. *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). Force is the essence of the crime of rape. *People v. Taylor*, 48 Ill. 2d 91, 100 (1971). The Criminal Code states that "the use of force or violence, or the threat of force or violence" includes, but is not limited to, "the following situations: (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat; or (2) when the accused has overcome the victim by use of superior strength or size, physical restraint or physical confinement." 720 ILCS 5/12-12(d) (West 2010). "There is no definite standard establishing the amount of force which the State is required to prove in order to prove criminal sexual assault, and each case must be considered on its own facts." *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992) (citing *People v. Bolton*, 207 Ill. App. 3d 681, 686 (1990), and *People v. Nelson*, 148 Ill. App. 3d 811, 820 (1986)).

¶ 53        Defendant argues that, even if G.R.'s testimony is credible, there is no evidence in her account that defendant used force to penetrate her. G.R. testified that she awoke on her stomach, still intoxicated, with a man on her back. She then attempted to push him off of her but was slow to do so. Defendant argues that this is because she had just woke up and was intoxicated and groggy, and not the result of defendant forcing himself on her. Defendant argues that, once G.R. woke up, he did not use any force to penetrate her, and that the only action that occurred was G.R. pushing him away. As a result, defendant argues the evidence was insufficient to prove him guilty of criminal sexual assault. Defendant also notes that, although one may be guilty of criminal sexual assault under section 12-13(a)(2) for having sex with a victim who is asleep, defendant was instead charged under section 12-13(a)(1), which requires the use of force. Nevertheless, defendant argues that his conviction should be reduced to a battery since there was no evidence of force.

¶ 54        However, defendant used force to penetrate G.R. because he used his weight while lying on top of G.R. to continue the act of penetration. "Force" within the meaning of section 12-12(d) requires something more than the force inherent in the sexual penetration itself. *People v. Denbo*, 372 Ill. App. 3d 994, 1007 (2007). A person can "passively force someone to continue with the sex act by using one's bodily inertia to prevent [the victim] from disengaging." *Denbo*, 372 Ill. App. 3d at 1008. Here, G.R. testified that when she awoke, she could not get up because defendant was on top of her. At this point, defendant was using his weight to continue the act of penetration while G.R. unsuccessfully attempted to stop him. The trial court heard G.R.'s testimony and found her credible, and we cannot say that no rational trier of fact could find that force was used to complete the sexual assault based on G.R.'s testimony. As a result, the evidence was sufficient for a guilty finding of penetration beyond a reasonable doubt, and we affirm defendant's conviction.

¶ 55        Defendant compares this case to *Vasquez*, where the appellate court reversed defendant's conviction for aggravated sexual assault because the State did not prove the element of force. *Vasquez*, 233 Ill. App. 3d at 529. The appellate court noted that the only evidence tending to show force was the 13-year-old male victim's testimony that the defendant placed his hand on the back of the victim's head and forced his head down onto the defendant's penis. *Vasquez*, 233 Ill. App. 3d at 527. The appellate court found that no rational trier of fact could have found

- 10 -

the element of force was proven beyond a reasonable doubt since the victim admitted that the defendant did not threaten or hurt him and that he did not resist the defendant's efforts. *Vasquez*, 233 Ill. App. 3d at 527. Defendant also cites *People v. Warren*, 113 Ill. App. 3d 1, 4-5 (1983), where the State failed to show "force or threat of force" where the taller and heavier defendant told the victim " 'I don't want to hurt you,' " lifted the victim and carried her toward a wooded area, pulled down her pants, and kissed her breasts and vaginal area. Defendant argues that the State presented even less evidence of force in the instant case than in *Vasquez* and *Warren* because G.R. was asleep when the assault began, awoke to find defendant on top of her, and felt a penis come out of her as she pushed him off. Defendant argues that there is nothing in G.R.'s testimony to support the claim that force was used to penetrate her because she was asleep throughout the assault, and that defendant made no attempt to continue the act when she woke up and that he instead retreated to the wall and covered his genitals, apologizing.

¶ 56        However, *Vasquez* and *Warren* are factually distinguishable because, contrary to defendant's claim, there was ample evidence of force since G.R.'s testimony indicates that defendant used his position and weight to continue the act of penetration while she attempted to push him away. The appellate court's discussion of withdrawn consent in *Denbo*, 372 Ill. App. 3d at 1007, is instructive here. In that case, the appellate court found that the actions of the female defendant, by sitting on top of the victim and not removing her hand from the victim's vagina, constituted force beyond what is inherent to the sex act itself. *Denbo*, 372 Ill. App. 3d at 1007. Although this case does not involve the issue of withdrawn consent, the appellate court discussed the element of force with a hypothetical: "[I]f B wishes to have sex no longer, B will surely disengage if he or she is able to do so, and if, by his or her physical posture, A prevents B from disengaging–for example, by continuing to lie on top of B [citation]–A thereby forces B to continue with the sexual penetration." *Denbo*, 372 Ill. App. 3d at 1007. The *Denbo* court concluded that, "One can, in a manner of speaking, passively force someone to continue with the sex act by using one's own bodily inertia to prevent the partner from disengaging. This would be force beyond that inherent to the sex act itself." *Denbo*, 372 Ill. App. 3d at 1008. In the instant case, defendant used his position and body weight as inertia to prevent G.R. from disengaging after she woke up. Although the State did not provide evidence concerning the respective height and weight of G.R. and defendant, G.R.'s testimony reveals that she struggled to free herself while defendant was lying on her back. As a result, defendant used force beyond the initial sex act to continue penetrating G.R. even as she attempted to push him away. We cannot say that the evidence at trial was so unreasonable, improbable, or unsatisfactory as to give rise to a reasonable doubt that defendant used force to penetrate G.R., and we decline to reverse defendant's conviction as a result.

¶ 57                    II. Opportunity to Argue at the Sentencing Hearing

¶ 58        Next, defendant argues that this case should be remanded for resentencing because the trial court denied both parties the opportunity to present argument at the sentencing hearing. Section 5-4-1(a)(5) of the Illinois Unified Code of Corrections (730 ILCS 5/5-4-1(a)(5) (West 2010)) provides that, at a sentencing hearing within a felony proceeding, "the court shall *** hear arguments as to sentencing alternatives." Defendant argues that the word "shall" signifies that argument is a mandatory component of a sentencing hearing, and that the trial court committed reversible error when it denied the parties an opportunity to argue. Although

defendant concedes that he is unaware of any case law directly concerning the mandatory nature of section 5-4-1(a)(5), he contends that it should be treated similarly to the requirement that the trial court must order and review a presentence investigation report prior to the imposition of a sentence. *People v. Youngbey*, 82 Ill. 2d 556, 565 (1980) (finding that a presentence report is for the "enlightenment of the court," as well as for the benefit of the defendant). As a result, defendant claims that this case should be remanded for a new sentencing hearing since the defense was not provided an opportunity to present argument, citing *People v. Hammonds*, 21 Ill. App. 3d 5, 7-8 (1974) (remanding case for resentencing where the trial court did not consider a presentence investigation report, hear evidence in mitigation or aggravation, or allow argument as to sentencing alternatives), and *People v. Sterling*, 62 Ill. App. 3d 986, 990-91 (1978) (remanding case for resentencing where the defense's argument at the sentencing hearing was restricted and defendant was barred from making a statement in allocution).

¶ 59    However, defendant has forfeited this issue on appeal because he neither objected at trial, nor filed a posttrial motion preserving the issue. "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). See also 730 ILCS 5/5-8-1(c) (West 2006) ("[a] defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence"). The challenge is considered waived on appeal if a defendant fails to satisfy either prong of this test. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In a plain error analysis, "it is the defendant who bears the burden of persuasion." *People v. Woods*, 214 Ill. 2d 455, 471 (2005). However, in order to find plain error, we must first find that the trial court committed some error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 60    In the instant case, the defense neither objected at trial that it was barred from arguing at the sentencing hearing, nor did it file a posttrial motion raising the issue. As a result, defendant has waived the issue on appeal. Defendant argues that the waiver rule should be relaxed in this case because the defense did not have an opportunity to object where the trial court announced the sentence immediately after defendant's statement in allocution. However, the appellate record indicates the defense had ample opportunity during the sentencing hearing to object, including well before the State's objection, and the defense never once expressed interest in arguing. We note that this may have been a strategic decision since the defense presented evidence in mitigation, while the State presented nothing at all. Defendant also argues that an objection would have been futile because the trial court already overruled the State's objection. *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005) (finding that "the fundamental importance of a fair trial and the practical difficulties involved in objecting to the trial court's conduct compel a less rigid application of the waiver rule"). However, the trial court's response, "You are done," was

clearly directed at the State's objection that it did not receive an opportunity to argue as it requested, and the trial court did not explicitly bar defendant from arguing.

¶ 61 Defendant additionally argues that his claims should be considered under the second prong of the plain error analysis because defendant has a substantial right to a fair sentencing hearing. *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (plain error doctrine allows a reviewing court to consider unpreserved errors that are so serious that they challenge the integrity of the judicial process); *People v. Blue*, 189 Ill. 2d 99 (2000). See also *People v. Simms*, 143 Ill. 2d 154, 170 (1991) (plain error in jury instructions was sufficiently grave to have deprived defendant of a fair sentencing hearing).

¶ 62 As stated, "the first step is to determine whether error occurred." *Piatkowski*, 225 Ill. 2d at 565. Here, the trial court did not commit an error that prejudiced defendant since it did not bar the defense from presenting argument. At the sentencing hearing, the State declined to present any evidence and instead informed the trial court that it only wished to argue. The defense then presented evidence in mitigation, but it did not argue or request an opportunity for argument. As the trial court began to pronounce the sentence, the State objected and advised the trial court that it still wished to argue, to which the trial court responded, "I don't do it like that. You are done." It is clear from this exchange that the trial court only disallowed the State's argument when it denied the State's request stating, "*You* are done." (Emphasis added.) Since the defense presented evidence but never requested argument, the trial court did not prevent the defense from presenting argument at the sentencing hearing.

¶ 63 Defendant claims that the trial court did in fact bar both parties from arguing because the "you" in that phrase "you are done" was plural and directed at both parties. Also, defendant claims that the trial court's statement, "I don't do it like that," served as a blanket prohibition against argument for both parties. However, " '[t]he plain error exception will be invoked only where the record *clearly* shows that an alleged error affecting substantial rights was committed.' " (Emphasis in original.) *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) (quoting *People v. Hampton*, 149 Ill. 2d 71, 102 (1992)). Even if defendant is correct that the trial court's statements were equivocal, they still would not amount to a clear and obvious error, which is required to find plain error. Here, the appellate record shows that the trial court was addressing the State and responding to its request for argument, and that it then denied only the State the opportunity to argue. As such, the trial court did not err because it did not bar defendant from presenting argument at the sentencing hearing, and we affirm defendant's conviction and sentence.

¶ 64                                                    CONCLUSION

¶ 65 For the foregoing reasons, we find that: (1) the State proved beyond a reasonable doubt that defendant penetrated G.R.'s vagina and used force to continue that penetration; and (2) that defendant was not prejudiced when the trial court denied the State an opportunity to argue at the sentencing hearing. As a result, we affirm defendant's conviction and sentence.

¶ 66 Affirmed.